IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CLYDE HARNAGE,

        Plaintiff,

vs.

        Case No. 05-3098-JTM

R.D. SWANSON, et al.,

        Defendants.

## MEMORANDUM AND ORDER

This matter comes before the court on the defendants' Motion to Dismiss or, in the alternative, for Summary Judgment (Dkt. No. 50). Defendants filed an extensive memorandum outlining the legal and factual basis for dismissal. Plaintiff did not file a timely response to defendants' motion. For good cause and without objection, the court grants defendants' motion.

## I. BACKGROUND

Plaintiff, a federal inmate, filed this pro se action claiming his constitutional rights were violated when defendants allegedly disregarded his medical condition (asthma) by assigning smoking inmates to his cell for unspecified periods of time while plaintiff was incarcerated at the United States Penitentiary in Leavenworth, Kansas (hereafter "USP Leavenworth"). Plaintiff alleges the exposure to second-hand smoke aggravated his current health problems and is likely to cause serious illness or death in the future. Plaintiff further alleges that staff physically assaulted him on May 22, 2003; that officials attempted to cover up the alleged assault; that

plaintiff was given untimely and inadequate treatment for the injuries he received from the alleged assault; and that he was routinely denied Administrative Remedy forms by USP Leavenworth staff. Plaintiff seeks a permanent injunction barring the defendants from housing smokers with the plaintiff either in his cell or cellhouse. Plaintiff also seeks compensatory and punitive damages.

**II. FINDINGS OF FACT**

The plaintiff in this matter is federal inmate, Clyde Harnage, register number 09107-074, (hereinafter "plaintiff"), who is currently incarcerated at the Federal Medical Center in Butner, North Carolina (FMC Butner). The plaintiff was convicted in the United States District Court, Eastern District of Louisiana, for Bank Robbery, Use of a Firearm, and Felon in Possession of a Firearm, in violation of Title 18, United States Code, Sections 2113, 924(c) and 922(g). The plaintiff was sentenced on January 27, 1993, by Judge Clement, to an aggregate sentence of 360 months of federal incarceration.

During the times relevant to the complaint, the plaintiff was incarcerated at USP Leavenworth. Plaintiff was incarcerated at USP Leavenworth from February 7, 2002, through August 7, 2003, and again from September 21, 2004 through May 29, 2005.

With respect to the relevant times of the complaint, the plaintiff was housed in various units, including some units which were designated as smoke-free, including the Special Housing Unit and C-1 Unit. The plaintiff was housed in the following units: February 7 - 13, 2002, Special Housing Unit (non-smoking since 1990's); February 13, 2002 - September 6, 2002, A Unit (smoking permitted); September 6 - 20, 2002, C-2 Unit (smoking permitted); September 20 - 23, 2002, Administrative Detention, Building 63 (smoking permitted); September 23 - October

3, 2002, C-2 Unit (smoking permitted); October 3 - 9, 2002, Administrative Detention, Building 63 (smoking permitted); October 9, 2002 - December 3, 2002, C-1 Unit (non-smoking unit at the time); December 4, 2002 - May 21, 2003, Special Housing Unit (non-smoking unit); May 21, 2003 - July 31, 2003, Administrative Detention, Building 63 (smoking unit); July 31, 2003 - August 7, 2003, Special Housing Unit (non-smoking unit); August 7, 2003 - September 21, 2004, plaintiff was housed at the United States Medical Center for Federal Prisoners in Springfield, Missouri (hereafter "USMCFP"); September 21, 2004 - May 29, 2005, Special Housing Unit (non-smoking unit).

Plaintiff was housed in smoke-free units while at USP Leavenworth from July 31, 2003. The entire institution of USP Leavenworth became completely smoke-free in November 2004. Additionally, plaintiff was housed in units which allowed smoking during the following time frames: February 13 - October 9, 2002; May 21, 2003 - July 31, 2003.

 Plaintiff was housed in the non-smoking C-1 Unit prior to his engaging in disciplinary infractions in December 2002. Because of his disciplinary infractions, plaintiff had to be housed in the Special Housing Unit and/or Building 63, Administrative Detention. Building 63, one of the older buildings at USP Leavenworth, and a separate building from the Special Housing Unit, was used to house an overflow of inmates from the Special Housing Unit. Building 63 is no longer being used by USP Leavenworth.

 On May 22, 2003, the Special Housing Unit was experiencing an overflow of inmates, and it was necessary to utilize Building 63 to house some inmates who were primarily in administrative detention. On that date, Lieutenant William L. Carey, defendant herein, supervised the transfer of plaintiff, who was already housed in a single cell in Building 63, and another

3

inmate, to cell 206 in Building 63. Both the plaintiff and the other inmate were restrained with their hands behind their backs during the transfer. Once the plaintiff and his cellmate were placed into cell 206, the door was secured and the food slot was opened in order to remove their restraints.

The plaintiff requested to have his restraints removed first, and plaintiff placed his hands in the food slot for his cuffs to be removed. The restraints were taken off by staff. Immediately after plaintiff's handcuffs were removed, he began to strike his cellmate on the head and face with closed fists. The cellmate had not yet had his restraints removed, and was handcuffed during the assault.

Defendant Carey gave a direct order to plaintiff to cease his assault. When the plaintiff did not comply, defendant Carey ordered staff to open the cell door in order to protect the cellmate from further injury and to maintain good order in the cellhouse. Defendant Carey was the first to enter the cell, along with staff members Senior Officer Specialists Thomas Hopkins, Edward Kendall, and Jeffrey Dixon. The officers attempted to contain the plaintiff and placed him in restraints; however, plaintiff continued to resist by swinging his arms in an aggressive manner and making threatening statements toward staff and his cellmate. Due to plaintiff's agitative and combative state, defendant Carey gave staff the order to place the plaintiff on the ground to contain his aggressive actions, and to place plaintiff in a position in which containment could be achieved.

Once the officers placed plaintiff on the ground, they were able to place restraints on him. Plaintiff continued to kick and move in an aggressive manner. He was placed in ambulatory restraints (leg irons, Martin chain around the waist, and handcuffs). Plaintiff's cellmate was

removed from the cell. Plaintiff was then examined by medical staff in the building and placed in cell 119.

At all times, the plaintiff was housed in Building 63, from May 21, 2003 through July 31, 2003, he was housed alone in his cell due to his disruptive nature and his inability to get along with other inmates.

As a result of his actions on May 22, 2003, the plaintiff was issued Incident Report No. 110680. The plaintiff went through the disciplinary process and was found to have committed the prohibited acts of Assault, a Code 224 violation, and Refusing an Order, a Code 307 violation. Special Investigative Services (hereafter "SIS") at USP Leavenworth investigated the May 22, 2003 incident. The investigation revealed that the procedures for the use of force upon the plaintiff were appropriately utilized during the May 22, 2003 incident, and in accordance with Bureau of Prisons (hereafter "BOP") policies and regulations.

It is the responsibility of USP Leavenworth Unit Managers to provide oversight to unit team staff, assist inmates with programming issues, review disciplinary matters, and provide assistance on issues of concern with the inmate population.

From May 2001 through August 2002, and again from July 2003 through September 2004, defendant Mark Sedillo was a Unit Manager for the C-Unit. From April 2002 through July 2003, and again from October 2, 2005 through the present, defendant Robert Bennett was a Unit Manager for the C-Unit. As Unit Managers, defendants Sedillo and Bennett conducted rounds throughout the Special Housing Unit and Building 63.

Plaintiff did not express any concern about moving to Building 63 to either defendant Sedillo or defendant Bennett. Plaintiff never complained to defendant Bennett about smoke or

about any harmful effects second-hand smoke was having on his health.

Inmates seeking to raise issues to Unit Managers in the Special Housing Unit and Building 63 generally approach the Unit Manager during their rounds. Alternatively, the inmate may send the Unit Manager an Inmate Request to Staff Member form. If the inmate seeks to pursue the formal remedy process, the inmate asks a member of his unit team for an informal resolution form (commonly referred to as a BP-8). Once the inmate completes the form describing the issue of concern, the inmate then gives the form to his counselor. Informal resolutions are usually handled by a counselor, who investigates the complaint and provides the inmate with a response. If an inmate is not satisfied with the response, the inmate then requests an institutional administrative remedy form (commonly referred to as a BP-9) from a unit team member. The inmate then fills out the BP-9 and again provides the form to his unit team member, who then forwards the BP-9 to the Administrative Remedy Clerk for processing.

Neither defendant Sedillo nor defendant Bennett recall plaintiff ever requesting administrative remedy forms from them. Both defendants Sedillo and Bennett deny that they ever denied the plaintiff administrative remedy forms.

Since 2001, defendant R. D. Swanson has been a Correctional Counselor for inmates in the C-Unit. As part of his duties as Correctional Counselor, defendant Swanson assists inmates with issues concerning their confinement, including programming issues and formal grievances. Defendant Swanson was plaintiff's Correctional Counselor when plaintiff was in the C-Unit in 2002 and when he was placed in the Special Housing Unit and Building 63. At no time did plaintiff complain to defendant Swanson about smoke in the C-Unit, in the Special Housing Unit, or in Building 63, nor did plaintiff complain to defendant Swanson about any harmful effects

second-hand smoke was having on his health.

Defendant Swanson does not recall plaintiff expressing a problem with having to move to Building 63, nor does defendant Swanson recall plaintiff requesting an informal resolution form (BP-8) from him for smoking-related or other issues.

As Correctional Counselor, defendant Swanson retains copies of BP-8 forms that he has provided to inmates. Plaintiff did not process a BP-8 form through defendant Swanson in 2002. The only BP-8 forms the plaintiff has processed through defendant Swanson were two forms related to medical issues. Plaintiff did not request any remedy forms from defendant Swanson for smoking-related issues. At no time did defendant Swanson deny plaintiff administrative remedy forms nor has he hindered plaintiff's ability to file through the administrative remedy program. Upon plaintiff's initial arrival and intake at USP Leavenworth, on February 7, 2002, plaintiff indicated he had a history of asthma. On February 12, 2002, Dr. William McCollum, Clinical Director at USP Leavenworth, reviewed the plaintiff's chart and approved him for the chronic care clinic for pulmonary issues.

On April 1, 2002, Dr. McCollum saw plaintiff in the Chronic Care Clinic for follow up on plaintiff's asthma. Plaintiff indicated he was doing well at that time. Plaintiff was advised to return in 91 days for follow up. In July and August 2002, plaintiff was again seen for follow up on his asthma, which was controlled with appropriate medication, and the plaintiff did not show signs of any progression of disease.

On September 23, 2002, the plaintiff was seen by one of the physician's assistants for routine follow up of his asthma. The physician's assistant who saw the plaintiff did <u>not</u> note that the plaintiff was specifically complaining of second-hand smoke nor that his asthma was

aggravated by second-hand smoke. Rather, the notation indicated the plaintiff was "feeling ok" on that date.

There was nothing clinically indicating the plaintiff's asthma condition was worsening due to any exposure to second-hand smoke. However, the physician's assistant did request a permit for the plaintiff to live in a non-smoking unit. The physician's assistant does not have authority to authorize a non-smoking unit permit.

As the clinical director, Dr. McCollum reviewed the request for permit for the plaintiff to live in a non-smoking unit. Dr. McCollum did not approve the request for permit because there was nothing in plaintiff's medical record to indicate that plaintiff's condition warranted a permit for a non-smoking unit at that time.  Dr. McCollum does not recall having ever seen a condition clinically requiring a request for a non-smoking unit to be made. If an inmate's condition is so severe that it requires a non-smoking unit, Dr. McCollum would consider the inmate's transfer to a medical center, due to the complexity of the inmate's condition.

Plaintiff's asthma condition has been in existence since prior to his incarceration. Plaintiff's medical records reveal that plaintiff has had various recommendations for him to be placed in a non-smoking unit by medical staff in other institutions, as far back as 1993.  While at USP Leavenworth, there were no clinical indications, such as significant changes with the plaintiff's peak flow (rate of how well a person breathes) or O-2 (oxygenation levels), which indicated a recommendation for plaintiff to be placed in a non-smoking unit. There is no clinical indication that second-hand smoke, if such smoke existed, caused plaintiff's asthma condition, aggravated plaintiff's asthma condition, or caused plaintiff any medical problems.

Plaintiff was seen for other various reasons throughout October and November 2002,

including review for a hunger strike, injury assessments, and lumbar (back) pain. Plaintiff was seen for follow-up on his asthma again on December 10, 2002, in the chronic care clinic, and again noted he was feeling well.

On May 22, 2003, subsequent to the use of force upon plaintiff, Dr. McCollum saw plaintiff when the plaintiff was complaining of pain in his mandible (jaw) area. Plaintiff was noted to have contusions on his face. An x-ray taken of plaintiff's jaw was inconclusive. The plaintiff was transported to St. John Hospital for further evaluation to rule out any fracture or more complicated issues. The plaintiff was diagnosed with a dislocated jaw and soreness of the jaw. After plaintiff's return to USP Leavenworth, he was provided with appropriate follow-up as recommended, including a referral to the dentist for further evaluation.

On May 23, 2003, Dr. McCollum saw plaintiff around noon-1:00 p.m. Plaintiff had complaints of vomiting blood. Upon evaluation, the plaintiff's blood pressure was found to be normal, with slightly elevated pulse. Plaintiff was again transported to St. John Hospital for further evaluation. At St. John Hospital, the plaintiff was diagnosed with esophageal varicies, related to cirrhosis of the liver. This condition is found frequently with liver conditions. Liver conditions, including these varicies, are slow progressing and are related to unhealthy living activity (drugs, alcohol) rather than being related to any use of force or second-hand smoke.

While the plaintiff complains of a minor delay in being seen on May 23, 2003, any delay would not have had an impact on his condition or treatment. The plaintiff was sent to St. John Hospital, where he was evaluated and recommended to have esophageal banding. On June 20, 2003, the plaintiff underwent an esophageal banding procedure at the outside hospital. Plaintiff was recommended for a transfer to the USMCFP in Springfield, Missouri, for treatment of his

9

worsening liver condition. Plaintiff was transferred on August 7, 2003.

Although the plaintiff did not raise further complaints to USP Leavenworth medical staff concerning his jaw, plaintiff did have some care concerning this condition while at USMCFP, including stabilization of the jaw with wiring. Plaintiff's medical records reflect that plaintiff has subjectively reported he had a history of a jaw injury prior to his incarceration, and that his jaw had been wired on two previous occasions. While the use of force on plaintiff on May 22, 2003, may have had an impact on the plaintiff's jaw being dislocated at that time, there are no indications that this incident permanently affected his pre-existing jaw condition.

The only notation in the plaintiff's medical chart where he may have reported a problem with second-hand smoke was the physician's assistant's notation that he wrote a permit for non-smoking unit on September 23, 2002. There are no specific complaints to any other medical staff noted in plaintiff's medical records, and plaintiff never voiced complaints to Dr. McCollum that second-hand smoke was causing him any health problems.

There is nothing clinically indicating the plaintiff's asthma, esophagus, liver condition, or jaw condition was caused or aggravated by second-hand smoke. While a trauma may have caused an aggravation to the plaintiff's jaw condition, there is no evidence of a permanent injury to this pre-existing condition. Plaintiff's liver condition and esophageal varicies, are not the result of any use of force. This slow progressing liver condition could have caused his symptoms to occur at any time. The timing of his vomiting blood around the time of the use of force is irrelevant.

Plaintiff's current condition is end-stage liver disease. He is currently incarcerated at the Federal Medical Center in Butner, North Carolina, for examination for a potential liver transplant and treatment for end-stage liver disease. The USP Leavenworth appropriately treated plaintiff's

medical conditions within the standard of care in the community.

The BOP has had policies in place to address the issue of inmate smoking, including designated smoking and non-smoking areas within an institution to limit exposure to such environmental tobacco smoke. The BOP has sought to address the issue of second-hand smoke since 1986, including giving attention to hazardous areas, elevators, rooms with little or no ventilation, auditoriums, class rooms, conference rooms, etc. Over the years, the agency has changed its policies to address new areas of concern and/or to limit, even more, the potential access to second-hand smoke. In 1990, the BOP changed its policy to limit smoking areas to the minimum number of areas possible, consistent with effective operations, and specifically prohibited smoking in certain areas.

In 1994, the BOP again changed its policy to establish all areas of the institutions as non-smoking, unless specifically identified by the Warden, and gave the Warden discretion to limit indoor smoking areas. In July 2004, the agency again changed its policy to permit the Warden to eliminate entirely smoking areas within the institutions. Subsequent to the issuance of this policy, and after providing the inmate population sufficient notice, in November 2004, the Warden at USP Leavenworth discontinued the sale of smoking items in the commissary and made the institution a smoke-free institution.

The BOP has a three-part administrative remedy program designed to address a federal inmate's concerns regarding any aspect of his or her confinement, found in Program Statement 1330.13, <u>Administrative Remedy Program</u>. This procedure is also codified in Title 28 of the Code of Federal Regulations, Section 542. This policy affords inmates confined in federal institutions the opportunity to voice their grievances and provides staff an opportunity to resolve

issues in-house prior to an inmate seeking relief through the judicial system.

Under the administrative remedy program for inmates, an inmate is required to first attempt informal resolution of the complaint, and if unsuccessful then must raise his complaint, with the informal resolution attached, to the Warden of the institution where he is confined. See 28 C.F.R. § 542.14. If dissatisfied with that response, the inmate may appeal his complaint to the Regional Director. 28 C.F.R. § 542.15(a). If dissatisfied with the Regional Director's response, the inmate may appeal to the Director, National Inmate Appeals, in the Office of the General Counsel in Washington, D.C. Generally, an inmate has not exhausted his remedies until he has sought review and received a final response at all three levels.

Since July 1990, BOP has maintained information related to administrative complaints, filed by inmates, under the Bureau Administrative Remedy Program in a national database called "SENTRY." One of the many functions of the SENTRY database is to track administrative remedy complaints and appeals. This system allows for a computerized search of complaints and appeals.

Each complaint is logged into SENTRY at the receiving location. If the complaint is an initial filing, it will be assigned a unique "Remedy ID Number" upon initial entry, which will follow the complaint throughout the appeal process. Each "Remedy ID Number" also contains an extender that identifies the level of review. The extension "F-1" indicates the complaint was filed at the institution level. The extension "R-1" indicates the complaint or appeal was filed at the regional level. The extension "A-1" indicates the appeal was filed at the national level. The number at the end of the extension may change if the appeal is refiled due to a technical problem, such as improper form, failing to include documentation, or improper filing at that level.

The automated administrative remedy records in the SENTRY database concerning each inmate are not purged and can be searched back as far as inception of the system. Indexes must be maintained in computer accessible form for twenty years and then destroyed. Pre-SENTRY indexes are maintained at the site of creation for twenty years and then destroyed. However, the hard copies of the actual administrative remedy files are maintained for a period of three years and then destroyed.

At all phases of the administrative remedy process, paper copies of the appeal documentation are returned to the inmate, along with the agency response. As such, if plaintiff did in fact exhaust his administrative remedies, he has, at one time or another, been in possession of copies of all the appeal documentation that would be necessary for him to prove exhaustion to the court.

The plaintiff filed administrative remedy 304152-F1 to the institution, received on July 9, 2003, with respect to his requests that Building 63 be smoke free and the sale of tobacco items be removed from the commissary. The remedy was denied by the Acting Warden on July 23, 2003. The plaintiff appealed to the Regional Director, via administrative remedy 304152-R1, received August 1, 2003. The Acting Regional Director denied the remedy on August 13, 2003. On September 29, 2003, the plaintiff appealed, via administrative remedy 304152-A1, to the National Inmate Appeals Administrator. On November 24, 2003, the plaintiff's appeal was denied and his administrative remedies were exhausted.

The plaintiff filed administrative remedy 306100-F1 to the institution, received on June 12, 2003, alleging staff physically assaulted him on May 22, 2003. The remedy was denied by the Warden on June 18, 2003. The plaintiff appealed to the Regional Director, via administrative

remedy 306100-R1, received July 7, 2003. The Acting Regional Director denied the appeal on July 11, 2003. On August 7, 2003, the plaintiff appealed, via administrative remedy 306100-A1, to the National Inmate Appeals Administrator. On September 11, 2003, the plaintiff's appeal was denied, and his administrative remedies were exhausted.

The plaintiff filed administrative remedy 306708-R1, on August 1, 2003, appealing the discipline imposed by the Disciplinary Hearing Officer (DHO) for the May 22, 2003, incident where plaintiff assaulted his cellmate. The Acting Regional Director denied his appeal on September 4, 2003. Plaintiff appealed the denial to the National Inmate Appeals Director, via administrative remedy 306708-A1. This remedy was denied on November 28, 2003.

The plaintiff filed administrative remedy 304145-F1 to the institution, received on July 9, 2003, regarding the refusal of medical attention after his alleged assault by staff. The remedy was denied by the Warden on July 15, 2003. The plaintiff appealed to the Regional Director, via administrative remedy 304145-R1, received July 22, 2003. The Acting Regional Director denied the remedy on August 8, 2003. On September 9, 2003, the plaintiff appealed, via administrative remedy 304145-A1, to the National Inmate Appeals Administrator. On October 14, 2003, the plaintiff's appeal was denied, and his administrative remedies were exhausted.

The plaintiff filed administrative remedy 304156-F1 to the institution, received on July 9, 2003, regarding allegations of staff misconduct with respect to staff putting "something extra" in his food. The remedy was denied by the Warden on July 24, 2003. The plaintiff appealed to the Regional Director, via administrative remedy 304156-R1, received on July 22, 2003. The Acting Regional Director denied the remedy on August 6, 2003. On September 4, 2003, the plaintiff appealed, via administrative remedy 304156-A1, to the National Inmate Appeals Administrator.

On October 23, 2003, the plaintiff's appeal was denied, and his administrative remedies were exhausted.

The plaintiff has not exhausted his administrative remedies with respect to second-hand smoke issues subsequent to November 24, 2003, or with respect to being subjected to second-hand smoke in any unit other than Building 63.

On December 22, 2003, the BOP's North Central Regional Office received administrative tort claim TRT-NCR-2004-1231, concerning his vomiting blood and being delayed in being sent to the outside hospital on May 23, 2003. The plaintiff's administrative tort claim was denied on July 13, 2004, and mailed to him via certified mail.

On December 22, 2003, the BOP's North Central Regional Office received administrative tort claim TRT-NCR-2004-1232, concerning staff harassment; and specifically that staff was putting something extra into his food in May 2003; his vomiting blood; and delay in being sent to the outside hospital. The plaintiff's administrative tort claim was denied on August 9, 2004, and mailed to him via certified mail.

On December 22, 2003, the BOP's North Central Regional Office received administrative tort claim TRT-NCR-2004-1233, alleging that plaintiff was forced to live with smokers and had cigarette smoke in his unit/cell. The plaintiff's administrative tort claim was denied on June 2, 2004, and mailed to him via certified mail.

On December 22, 2003, the BOP's North Central Regional Office received administrative tort claim TRT-NCR-2004-1257, concerning plaintiff's alleged assault by staff on May 22, 2003. The plaintiff's administrative tort claim was denied on June 16, 2004, and mailed to him via certified mail.

**III. MOTION TO DISMISS**

**A. Standard of Review**

Federal courts are courts of limited jurisdiction and may exercise jurisdiction only when specifically authorized to do so. Castaneda v. INS, 23 F.3d 1576, 1580 (10th Cir. 1994). "A court lacking jurisdiction must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." Scheideman v. Shawnee County Bd. of County Comm'rs,, 895 F. Supp. 279, 280 (D. Kan.1995) (citing Basso v. Utah Power and Light Co., 495 F.2d 906, 909 (10th Cir. 1974)); Fed. R. Civ. P. 12(h)(3). The party seeking to invoke a federal court's jurisdiction sustains the burden of establishing that such jurisdiction is proper. Id. When federal jurisdiction is challenged, the plaintiff bears the burden of showing why the case should not be dismissed. Jensen v. Johnson County Youth Baseball, 838 F. Supp. 1437, 1439-40 (D. Kan. 1993).

Jurisdictional challenges under Rule 12(b)(1) typically take two forms: facial attacks on the sufficiency of jurisdictional allegations and factual attacks on the accuracy of those allegations. Holt v. United States, 46 F.3d 1000, 1002-03 (10th Cir. 1995). "A facial attack questions the sufficiency of the allegations in the complaint as they relate to subject-matter jurisdiction." Goslin v. Kickapoo Nation Dist. Ct., No. 98-4107-SC, 1998 WL 1054223, at *1 (D. Kan. Dec. 2, 1998). The Tenth Circuit has stated that "a district court must accept the allegations in the complaint as true" when reviewing a facial attack on a complaint. Holt, 46 F.3d at 1002.

"A Rule 12(b)(6) motion to dismiss will be granted only if it appears beyond a doubt that the plaintiff is unable to prove any set of facts entitling [him] to relief under [his] theory of

recovery." Poole v. County of Otero, 271 F.3d 955, 957 (10th Cir. 2001) (citing Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The court must accept all the well-pled allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." Boyd v. Runyon, No. 94-1557-JTM, 1996 WL 294330, at *1 (D. Kan. May 23, 1996) (citing Williams v. Meese, 926 F.2d 994 (10th Cir. 1991)). "The [c]ourt, however, need not accept as true those allegations that are conclusory in nature, i.e., which state legal conclusions rather than factual assertions." Fugate v. Unified Gov't of Wyandotte, 161 F. Supp. 2d 1261, 1263 (D. Kan. 2001) (citing Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991)).

**B. Analysis**

Defendants raise several grounds for dismissal, including: 1) the lack of subject matter jurisdiction; 2) the lack of compliance to filing deadlines; 3) lack of personal jurisdiction; 4) the failure to satisfy the requirements for respondeat superior liability; 5) the failure to file within the statute of limitations for personal injury claims; and 6) the failure to exhaust remedies.

First, defendant raises the issue of subject matter jurisdiction. The court lacks subject matter jurisdiction because defendant cannot bring an action against BOP and the Bureau of Prisons Inmate Trust Fund (hereafter "ITF") since they are entities entitled to sovereign immunity for actions in their official capacity. See F.D.I.C. v. Meyer, 510 U.S. 471, 483-86 (1994). See also Mansoori v. Lappin, No. 04-3241-JAR, 2005 WL 2387599, at * 3 (D. Kan. Sept. 21, 2005) (Bivens claim against ITF, a governmental entity, dismissed with prejudice.). The court agrees that all individual capacity claims allege against the BOP, ITF and the defendants acting within their official capacities lack subject matter jurisdiction.

Next, the defendant raises the issue of filing deadlines. The court also finds that the

Federal Torts Claim Act (hereafter "FTCA") cases are barred when they are filed beyond the six-month filing provision under 28 U.S.C. § 2401(b). Since defendant received the final administrative action on his tort claim on August 9, 2004, any further action should have been filed by February 9, 2005. Defendant filed his complaint on February 25, 2005, more than two weeks after the deadline. Because the FTCA constitutes a limited waiver of the Government's sovereign immunity and plaintiff has failed to satisfy the timing requirements set forth in § 2401(b), the district court lacks subject matter jurisdiction to proceed under the FTCA. See Dahl v. United States, 319 F.3d 1226, 1228 (10th Cir. 2003).

Defendants also raise the issue of personal jurisdiction, arguing that Harrell Watts, Administrator of National Inmate Appeals for BOP, in his individual capacity, was not personally served process nor has he waived service and that any service of him should be ineffective since he is not within this jurisdiction. The only personal involvement of defendant Watts was his signature to an administrative appeal in Washington, D.C. Such action alone is not sufficient to exercise jurisdiction over Mr. Watts. See Mansoori, 2005 WL 2387599, at *5 (other cases omitted). Plaintiff has not responded to this argument, thus the court dismisses defendant Watts pursuant to Fed.R.Civ.P. 12(b)(2).

To the extent plaintiff seeks to hold certain defendants responsible under the theory of respondeat superior, the court dismisses defendants Watts, McCollum, Miller, Nitchals, Howell, Sedillo, Buser, Carey, and Bennett in their supervisory capacities because plaintiff has failed to establish an affirmative link with these persons and plaintiff's alleged injury. See Kaiser v. Lief, 874 F.2d 732, 736 (10th Cir. 1989) (holding doctrine of respondeat superior does not apply to "an officer who has no affirmative link with the constitutional violation"). The court also finds a

lack of personal participation by defendants Watts, McCollum, Miller, Nitchals, Howell, Estate of Connor, Sedillo, Buser, Smith or Bennett as to plaintiff's claim of physical assault. As such, plaintiff's Eighth Amendment claim of physical assault should be dismissed as to these defendants.

Pursuant to Fed.R.Civ.P 12(b)(6), defendants ask the court to dismiss this action because the two-year statute of limitations ran. K.S.A. § 60-513 limits tort actions to a two-year statute of limitations for injuries to the rights of another, and Bivens actions are subject to state statute of limitations for personal injuries. Since plaintiff filed his complaint on February 25, 2005, any incident prior to February 25, 2003 is outside the statute of limitations.

Defendants also argue that plaintiff failed to exhaust his administrative remedies. The Prison Litigation Reform Act (hereafter "PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all of his administrative remedies before filing a federal action in court. Porter v. Nussle, 534 U.S. 516, 524-25 (2002); Booth v. Churner, 523 U.S. 731, 739 (2001). The Tenth Circuit has also held that "the PLRA contains a total exhaustion requirement, and . . . the presence of unexhausted claims in [prisoner]'s complaint require[s] [a] district court to dismiss his [or her] action in its entirety without prejudice." Ross v. County of Bernalillo, 365 F.3d 1181, 1189 (10th Cir. 2004). Defendants raise the issue of several unexhausted remedies and the lack of specific identification of certain defendants. In reviewing the findings, the court finds plaintiff failed to exhaust his remedies with respect to his second-hand smoke issues subsequent to November 24, 2003, and with respect to being subjected to second-hand smoke in any unit other than Building 63. Since plaintiff has not responded to these allegations, the court accepts them as true and dismisses plaintiff's complaint without prejudice in its entirety. Fitzgerald v. Corrections Corp.

of America, 403 F.3d 1134, 1140-1141 (10th Cir. 2005).

Because failure to exhaust administrative remedies warrants dismissal of plaintiff's action, the court does not reach the defendants' remaining arguments.

IT IS ACCORDINGLY ORDERED this 2d day of February, 2006, that the court grants defendants' motion and dismisses this action as set forth herein (Dkt. No. 50).

                                              s/ J. Thomas Marten  
                                              J. THOMAS MARTEN, JUDGE